UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION



| | | |
|---|---|---|
| RHINO LININGS USA, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN A. HARRIMAN, RHINO SALES, | ) | |
| INC. n/k/a VON MARTIN, INC., | ) | |
| | ) | |
| Defendants/Counter-Claimants, | ) | |
| | ) | |
| MARTIN A. HARRIMAN, RHINO SALES, | ) | CASE NO. 1:07-cv-1087-DFH-JMS |
| INC. n/k/a VON MARTIN, INC., | ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUTO X-10'D, INC., | ) | |
| | ) | |
| Third Party Defendant. | ) | |

ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The principal parties in this diversity jurisdiction case are a national
manufacturer and a former local franchisee whose contract was terminated. The
third-party defendant is the new franchisee that replaced the former one. The
parties have filed cross-motions for summary judgment. As explained below, all
three motions are granted in part and denied in part.

Pursuant to a written agreement, defendant Martin Harriman became a Rhino Linings dealer in July 1995, with the exclusive right to sell the products of plaintiff Rhino Linings, Inc. in Indianapolis and the seven surrounding counties. Rhino manufactures polyurethane-based formulations for industrial, commercial and retail applications, most notably used as sprayed-on linings for truck beds and trailers.   Harriman's dealer contract was for a term of ten years with a provision for subsequent year-to-year renewals if the parties reached new agreements each year on the dealer quota for product purchases.  During that ten year period Harriman, through his business then known as Rhino Sales, Inc. and now known as Von Martin, Inc., established operations in as many as six cities. In July 2005, following the expiration of the first ten years, the parties renewed the dealer contract at the same minimum quota that had been in place during the first ten years.  The following year the same thing occurred, though it is not clear whether a written renewal was ever signed for the second renewal.

In December 2006, Rhino national sales manager Jeff Savell wrote to Harriman to inform him that his quota for the next renewal (July 2007) would be for the annual purchase of over 79,000 pounds, a nearly four-fold increase above his current yearly quota of 5,000 pounds for each of his four stores.  Savell's letter asked Harriman to contact Rhino so that the two parties could agree on a specific quota for renewal.  A month later Savell wrote again, this time indicating that, based on truck sales within Harriman's territory, the quota for renewal would be in excess of 36,000 pounds – much lower than Rhino's initial proposal but still a

dramatic increase over the current quota.  During this time period, Harriman was looking for purchasers for some of his stores.  A third letter came in May 2007, after Harriman had sold one of his stores.   In the letter, Savell insisted that Harriman would still need to agree to a 36,000 pound quota, more than double Harriman's past quota for his three remaining stores.[1]  Efforts by Harriman to obtain Rhino's agreement to extend the contract without such a sharp escalation of his quota were unsuccessful, as were his efforts to sell his business and territory rights.

On August 15, 2007, Rhino sent Harriman a letter informing him that his right to sell Rhino products had expired and that he was to cease using its trademarks, service marks, and products.  The letter also informed Harriman that he owed Rhino more than $79,000 for prior product and equipment purchases. In September 2007, third-party defendant Auto X-10'D, Inc. ("AutoX"), a former competitor of Harriman's, received authorization to sell Rhino products in Harriman's former territory.   Earlier in the year, AutoX had discussed with Harriman the purchase of one or more of his stores, and they had also had some similar discussions several years previously.  AutoX received its license to offer Rhino products from Ziebart International Corporation, which had entered into a nationwide development agreement with Rhino in 1999, the stated purpose of

---

[1]Harriman at one time owned and operated as many as six stores, but through sale or closure had, by 2007, reduced the number of stores he owned to three.

which was to allow Rhino dealers to acquire Ziebart franchises and to allow Ziebart businesses to sell Rhino products and services.

AutoX acquired its first Ziebart franchise in 1982 and went about expanding the number of its aftermarket auto and truck accessory stores in the central Indiana market.   Despite the 1999 Ziebart/Rhino national development agreement, Harriman's Dealer Contract had previously prevented AutoX from obtaining the rights to sell Rhino products in those Indiana counties where Harriman held the exclusive rights.   Although it had been able to offer Rhino products in its stores outside of the Indiana counties reserved to Harriman, AutoX had offered a competing spray on bed-lining product in the stores it operated in direct geographical competition with Harriman in his Rhino territory.

Some time in the 2000 to 2001 time frame, Harriman had attempted to obtain a Ziebart franchise for his Columbus, Indiana store; however, one of AutoX's principals, Denny Fryman, and another Indiana Ziebart dealer, who also competed with Harriman's stores, apparently objected to Harriman obtaining the right to sell  Ziebart products, prompting an attempt by Rhino's CEO to broker a compromise that would have allowed Harriman to become a Ziebart dealer and the two objectors to purchase a lesser Rhino bed lining product to sell under a Ziebart trade name.  The compromise was never reached and Harriman never became a Ziebart dealer.  But Harriman claims that AutoX and other Ziebart dealers later began to advertise within his exclusive territory, claiming to offer Rhino products.

A little more than a month after it sent its August 15, 2007 letter to Harriman confirming the expiration of the dealer contract, Rhino filed this lawsuit seeking to enjoin Harriman from any continued use of the Rhino name or sale of its products and to recover the money it claims it is owed by Harriman for products he ordered. The parties quickly reached an agreement on the terms of a permanent injunction prohibiting Harriman from acting as a Rhino dealer or using its products. Harriman then filed counterclaims against Rhino contending that the company had wrongfully terminated the dealer contract and had breached the exclusivity and good faith and fair dealing provisions of the agreement.

Harriman has also filed a third-party complaint against AutoX, the entity that took over his former Rhino territory. Harriman asserts AutoX gained access to his territory by tortiously interfering with his contractual relationship with Rhino and conspiring with Rhino to cause his dealership rights to be terminated. Harriman's third-party complaint includes a separate unfair competition claim against AutoX.

It is undisputed that AutoX's business manager Jim Harris contacted Rhino's CEO at some point in 2006 to ask about acquiring Harriman's exclusive geographical region and that a Rhino account manager mentioned in an e-mail in early 2007 that Rhino was helping AutoX to acquire Harriman's territory. Furthermore, Jim Harris of AutoX had at least one conversation with Harriman

in 2007 regarding acquiring Harriman's business.  Harriman maintains that discussions with Harris regarding a purchase of his business ceased rather abruptly, and he suspects that Rhino's insistence on an unreachable quota in order for him to renew the Dealer Contract was an alternative strategy by Rhino to allow AutoX to obtain the territory.

Rhino, Auto X, and Harriman have all moved for summary judgment in their favor on some or all of the claims brought by them or against them.  This entry addresses all of those motions.

I.     *Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party must show there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual issue is material only if resolving the factual issue might change the  suit's outcome under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented.  *Id.*

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reversing summary judgment); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reversing summary judgment). The court must view the evidence in the light reasonably most favorable to the non-moving party. *Paz*, 464 F.3d at 664; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006).

The fact that all parties have filed motions for summary judgment does not alter the applicable standard and does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Services, LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). The court must consider each motion independently and must deny any motion as to which there is a genuine issue of material fact. *E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Harms v. Laboratory Corp. of America*, 155 F. Supp. 2d 891, 906 (N.D. Ill. 2001). Thus, in considering cross-motions for summary judgment, the court must consider the evidence through separate lenses, always allowing the non-moving party the benefit of all conflicts in the evidence and choices among reasonable inferences from that evidence.

II.     *Rhino's Breach of Contract Claim*

After the parties reached an agreement on terms of a permanent injunction barring Harriman's use of Rhino's trademarks, service marks, and products, Rhino's remaining claim is its breach of contract claim against Harriman for the money it says it is owed for chemical products he ordered.  To support its motion, Rhino has submitted the affidavit of Sandra Sue Roberts, its vice president and CFO.  She attests to Harriman's unpaid bill of $79,038.72 for chemical products he ordered and received from Rhino prior to the termination of the Dealer Contract.  She provides no back-up invoices or purchase orders which might detail and support her calculation.  While there are some spreadsheets submitted as exhibits to her deposition, it is clear from her deposition testimony that these spreadsheets do not contain the entirety of the accounting entries that would be necessary to calculate an accurate account balance.

Harriman responds by submitting his own affidavit stating that he acknowledges a debt to Rhino for past purchases but disputing the amount claimed as due and owing.  He indicates his account was entitled to certain credits for product returns and that he has been unable to obtain documentation from Rhino that would allow him to reconcile the amount sought by Rhino with his own accounting records.  Like Rhino, Harriman offers no individual account balance documentation to assist in accurately computing what he owes.  In addition, Harriman points to portions of Roberts' deposition where she admitted to errors and discrepancies in the spreadsheets she used to compute the amount of money still owed Rhino by Harriman.  Harriman contends that he is entitled to an

inference that credits were likely not applied and that the amount he owes is not consistent with the amount claimed by Rhino.

As the Seventh Circuit has often observed, most summary judgment affidavits are self-serving, but that does not mean they may not be used to support or oppose summary judgment. See, *e.g.*, *Payne v. Pauley*, 337 F.3d 767, 771-72 (7th Cir. 2003). In this case, the problem is that both the Roberts and Harriman affidavits are conclusory. Neither provides the *specific* facts needed to establish a fact beyond reasonable dispute. See Fed. R. Civ. P. 56(e). As the moving party on a claim for which it bears the burden of proof, Rhino has failed to establish beyond reasonable dispute its claim for $79,038.72. Its motion for summary judgment on the claim must be denied.

III.   *Harriman's Counterclaims for Breach of the Dealer Contract*

The dealer contract between Rhino and Harriman was governed by California law and contained the following provisions relevant to Harriman's counterclaim of breach:

1.01   PURPOSE:   The purpose of THIS AGREEMENT is to establish DEALER as the exclusive Dealer for RHINO'S services and products, . . ., and to set forth the respective duties, obligations and responsibilities of RHINO and of DEALER in the sale of these products/services by RHINO to DEALER, and the sales of products by DEALER.

1.03   FINANCIAL AND PHYSICAL RESOURCES:   RHINO has elected to enter into this AGREEMENT with DEALER with the recognition that RHINO's success depends on financially sound, responsible, efficient, vigorous and successful independent Dealers.  It is mutually agreed that the conduct of business between the parties will be fair and will be free of false, deceptive or misleading advertising, merchandising, pricing, and service practices.  . . . .

1.05   EXPECTATIONS OF PARTIES:  It is the expectation of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, obligations and responsibilities, a mutually satisfactory relationship between them will be established and maintained.  . . . .

2.02   EXCLUSIVE TERRITORY LIMITATIONS:  During the continuance of THIS AGREEMENT, RHINO shall not appoint another distributor or different person, firm, or corporation to sell or distribute the same products and services in any exclusive geographic area granted to DEALER.   RHINO agrees that RHINO will not sell/place any of RHINO's products, equipment or services under the RHINO name or any other name, to any business entity located within DEALER'S

Exclusive Territory[2], if said business entity intends to offer RHINO products or services for sale.

2.09   SELLING RIGHTS RESERVED:   RHINO reserves the right to sell, directly or through its other distributors any of its products or services to any of the following located in DEALER'S Exclusive Territory, on the condition that the products or services are for consumption and not for resale.

A.   The United States Government . . .
B.   Any foreign government . . .
C.   Any national corporations.

2.10   FREE TO SOLICIT BUSINESS:  It is agreed that it is to the benefit of all parties that RHINO and all its authorized DEALERS be free to solicit business from any source.   Subcontracting of work is encouraged.  The terms and conditions will be negotiated in good faith between or among RHINO and its various DEALERS as the situation warrants.

At the heart of Harriman's counterclaims is the assertion that Rhino failed to deal with him fairly and in good faith.  Section 1.03 requires both parties to act fairly and free from deception when doing business with each other.  Section 1.05 sets forth an expectation that the parties will fully and faithfully observe and perform all the duties, obligations, and responsibilities they have accepted.  Even without these stated obligations of good faith in the written agreement, California law implies a duty of good faith and fair dealing in performance and enforcement of every contract.  *Carma Developers (Cal), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 371-72, 826 P.2d 710 (1992).

---

[2]The exclusive territory initially granted Harriman included the following Indiana counties:  Hamilton, Boone, Hendricks, Morgan, Johnson, Shelby, Hancock and Marion.  A later written amendment to the dealer contract eliminated Hancock County from the exclusive territory.

A.    *Bad Faith Failure to Renew Dealership*

Harriman contends that Rhino acted in bad faith in dealing with him concerning the renewal of the dealer contract for the renewal year beginning in July 2007.  According to Harriman, Rhino insisted on a quota that was more than double previous quotas, despite the fact that, according to the testimony of Pauline Chin, Rhino's legal administrator, the company was not enforcing quotas against its dealers during that time frame.  Adding insult to injury, when AutoX took over Harriman's territory in 2007, Rhino and AutoX agreed on a quota well below the quota that Rhino had tried to impose on Harriman as a condition of extending his franchise.  Harriman contends that these facts and others show an effort on the part of Rhino to rid itself of Harriman and to transfer his territory to AutoX, which had become the biggest Rhino/Ziebart dealer in the country and also occupied a seat on the Rhino Dealer Advisory Board.

Harriman relies on additional facts to support summary judgment in his favor.  In his affidavit he avers that Rhino ignored his efforts, beginning in 2006, to obtain a long term renewal of his dealer contract.  The lack of any Dealership Renewal Worksheet in Rhino's dealer file on him is, according to Harriman, further evidence that there was no good faith effort to reach an agreement on renewal in 2007.  Prior to the time for renewal of a Rhino dealership agreement, someone at Rhino prepares  Dealership Renewal Worksheet and sends it to Ms. Chin, who processes renewals.  Chin testified that if a renewal worksheet had

been prepared for Harriman's territory, it would have been put in Harriman's dealership file, but no such worksheet was in his file.  She had no personal knowledge as to why such a worksheet was not in Harriman's file.

Rhino seeks to avoid summary judgment against it and insists that it is entitled to a summary judgment in its favor on the issue of bad faith failure to renew.  Its first argument is that the dealer contract was never terminated but simply expired pursuant to its own terms because the parties never agreed on a new quota.  It is undisputed that the dealer contract was to expire in July 2007 unless agreement could be reached on a new quota, and that no agreement was reached.  However, the court interprets the dealer contract as requiring Rhino to negotiate in good faith toward a mutually agreeable quota for renewal.  Rhino's argument is undermined by its obligation to act in good faith in its dealings with Harriman and in the performance of the contract and by Harriman's evidence supporting an inference that Rhino simply decided to replace Harriman with AutoX and insisted in bad faith on an arbitrary and unreasonable quota as a means of reaching that end.  It is undisputed that Rhino made an offer to renew Harriman's Dealer contract based on a 36,000 pound quota, which was more than double the previous quota per store.  There is a genuine issue of material fact as to whether that proposal was reasonable and made in good faith, especially in light of Rhino's failure to enforce other quotas and its agreement to use a much lower quota for AutoX when it took over Harriman's territory.

Rhino also relies on Harriman's testimony that he never proposed a specific alternative quota to the 36,000 pound quota proposed by Rhino.  Rhino contends that Harriman cannot maintain a claim of bad faith failure to negotiate when he did not propose an alternative number for the quota.  This argument ignores Harriman's contention, supported by copies of letters as well as his own testimony, that he had been trying for more than a year to negotiate a new agreement and that he had asked to enter into discussions regarding the quota. After placing phone calls and leaving messages with several management personnel at Rhino, regarding the need for a meeting or phone conference to discuss a new quota, Harriman claims he was given the "run around" or his messages were ignored.  Rhino denies this, but this is all a matter of factual dispute that cannot be resolved on summary judgment.

Harriman further claims that the 36,000 pound quota was presented as a take it or leave it proposition and was entirely unreasonable in light of past performance and economic conditions in the territory.  Because Rhino disputes Harriman's efforts to negotiate a new quota and supports its position with a July 12, 2007 letter from Harriman to Jeff Saville that contains no attempt to propose an alternative quota, Harriman is not entitled to summary judgment. However, the circumstantial evidence offered by Harriman with regard to the actions of Rhino in its dealings with him, AutoX and others is more than ample to avoid summary judgment based on his failure to make a specific counter-proposal.

B.     *Breach of Exclusivity Provisions*

Harriman's counterclaim includes a count alleging that Rhino's dealings with Ziebart or AutoX, and Dallman Industrial Corporation violated the exclusivity provisions of the dealer agreement.[3]  Harriman asserts in the "Additional Material Facts" subsection of his supporting brief that Rhino, by entering into the original nationwide development agreement with Ziebart in 1999, acted deceptively and in bad faith in violation of the dealer contract.  Harriman did not pursue the point in his argument, and, as pointed out by Rhino, the national development agreement with Ziebart was executed in March 1999.  California has a four year limitations period for breach of contract actions, Cal. Code Civ. Proc. § 337, which bars Harriman's pursuit of a breach of contract claim based on that 1999 arrangement.

The argument Harriman develops in the argument section of his brief is directed at Rhino's recruitment of and communication and interaction with AutoX after the national agreement.  In short, Rhino allowed AutoX, through its Ziebart franchise arrangement, to become a purveyor of Rhino products in areas outside Harriman's territory.  According to Harriman, Rhino then looked the other way when AutoX used the expertise and know-how it gained to compete against Harriman in its stores within his exclusive territory.  Eventually, Rhino's actions

---

[3]In his pleadings, Harriman also alleges that Rhino breached the exclusivity provisions of the contract in its dealings with a company known as Wax Werks. In response, Rhino claimed that it has never done business with Wax Werks, and Harriman has abandoned any claim of breach in that regard.

led to AutoX taking over Harriman's territory.  Harriman also complains that

Rhino recruited additional dealers in his territory before his contract had expired.

Harriman complains about the following actions:

1.   AutoX was given the Rhino "know-how" when its Ft. Wayne, Indiana
     store obtained the right to sell Rhino products and services through
     Zeibart, even though AutoX had competing stores within Harriman's
     exclusive territory that sold similar non-Rhino products.

2.   AutoX, which competed with Harriman, was given an influential
     position on Rhino's Dealer Advisory Board.

3.   In 2006, AutoX and Rhino had discussions regarding AutoX's desire
     to sell Rhino products at its stores within the territory then exclusive
     to Harriman.  According to Harriman, the difficulties he faced with
     Rhino, including Rhino's sudden interest in increasing his quota,
     came only after AutoX expressed an interest in acquiring the right to
     sell Rhino products within his exclusive territory.

4.   In February 2006, there was an email exchange in which a Rhino
     manager was soliciting Pearson Ford, an auto dealer and repair shop
     within Harriman's exclusive territory, and Pearson was inquiring if all
     hurdles had yet been removed so that it could become a Rhino dealer.
     A later email chain shows that the Rhino employee soliciting Pearson
     was told by Pauline Chin that Pearson's shop was within Harriman's
     territory, that negotiations with Harriman for renewal were at a
     standstill, and that nothing further could be done with Pearson until
     that issue was resolved.

5.   A February 2007 intra-company email discussed the recruitment of
     Ziebart dealers in areas where other dealers had rights to sell Rhino
     products.  The email was sent to several individuals, including the
     new CEO of Rhino, stating that Rhino was helping the principals of
     AutoX to buy out Harriman.

At different points in his supporting briefs, Harriman discusses these

incidents as though each represents the foundation for an individual breach of

contract action.  In the court's view, they represent circumstantial evidence

supporting Harriman's claim of bad faith termination of his agreement. But the dealer contract did not prohibit Rhino from offering its products outside of Harriman's territory to companies that otherwise competed with Harriman inside his territory, nor did it prohibit Rhino from appointing such a dealer to the advisory board. The fact that Rhino had discussions with other potential dealers regarding Harriman's territory is not itself an independent breach of the dealer contract. Few contracts last forever; Rhino was entitled to look to future choices if Harriman might falter, just as Harriman was free to explore other business options for himself. What matters is the parties' actions. The five matters identified above were not independent breaches of Rhino's contract with Harriman, and Rhino is entitled to summary judgment to that effect.

There is, however, one situation that amounted to a breach of the exclusivity provisions of the contract. Dallman Industrial Corporation is an Indiana company that manufactures automatic teller machine kiosks, enclosures, and canopies and that it is located within the boundaries of Harriman's exclusive territory. In 2001, Rhino opened a direct account with Dallman to supply it with Rhino spray products so that Dallman could apply them directly to the outside of its enclosures and canopies as a part of its manufacturing process. Before Rhino intervened and opened a direct account, Dallman had been having one of Harriman's locations spray the Rhino lining onto its ATM products. Rhino's contract with Dallman ended in 2005.

Rhino's contract with Dallman prohibited Dallman from applying the Rhino products in connection with any automotive use, and Dallman did not sell, distribute, or use the products outside its own manufacturing process.  Rhino contends that Section 2.10 of its contract with Harriman specifically reserved to Rhino the right to solicit such business.  Rhino argues that because Dallman was an original equipment manufacturer ("OEM") and did not offer the Rhino products for sale other than as components of the products it manufactured, there was no violation of Section 2.02 of the dealer contract.

Section 2.02, 2.09 and 2.10 of the dealer contract all relate to Rhino's selling product or soliciting business within Harriman's exclusive territory.  As applied to the Dallman business, each of these provisions is, by itself, ambiguous in some respect.  California law provides that a contract should be read as a whole, of course, with each clause having meaning and effect and each also assisting in the interpretation of the others.  See Cal. Civ. Code § 1641.  Contract interpretation is a matter of law for the court.  When an instrument is susceptible to multiple interpretations, a court should favor a construction which makes the contract reasonable, enforceable, and definite.  Cal. Civ. Code § 1643; see also *Badie v. Bank of America*, 67 Cal. App. 4th. 779, 800, 79 Cal. Reptr. 2d 273, 286 (1998).  When ordinary principles of contract interpretation do not allow for a resolution of the ambiguity, the contract language should be construed against the party who drafted it.  Cal. Civ. Code § 1654.

Section 2.02 forbids Rhino from selling product to any business entity within Harriman's territory if that entity intends to offer the Rhino product for sale. Whether that prohibition against Rhino's sale of its product applies when that product is resold as a *component* of another product is left unclear.

Section 2.09 states that Rhino reserves the right to sell directly to national corporations and certain government entities, but Dallman was neither. Even then the reservation is qualified by language stating that it is "on the condition that products or services are for consumption and not for resale," again leaving unanswered the question whether an "OEM" applying a Rhino product in its own manufacturing process for resale of the entire product has consumed the product or resold it.

Finally, Section 2.10 stated that Rhino and its authorized dealers were "free to solicit business from any source" and that "subcontracting" was encouraged with the terms and conditions to be negotiated in good faith between Rhino and the dealers as warranted. This provision clearly did not mean that Rhino was free to ignore its dealers' exclusive territories. The provision allowed *solicitation* of business. But to prevent this provision from completely undermining an exclusive territory, it must be read as requiring Rhino in such instances to negotiate a good faith agreement with the local dealer before Rhino could actually sell directly (not merely solicit business) in a dealer's exclusive territory.

The contract did not allow Rhino to solicit business from anyone it chose and then to sell the products it has agreed to allow Harriman to sell exclusively in his territory without reaching some acceptable arrangement with Harriman. To find otherwise would frustrate the geographic exclusivity clause of the agreement. The undisputed facts show that Rhino violated the dealer agreement from 2001 to 2005 by selling to Dallman. Details are sparse in this record, amid the many issues the parties have briefed, but the undisputed facts show that Rhino is liable for the breach, at least to the extent that Harriman can prove damages. On this portion of this claim, Harriman is entitled to partial summary judgment on the question of liability.

IV.    *Harriman's Third-Party Complaint Against AutoX*

Harriman relies on two theories against AutoX.  First, he maintains that AutoX tortiously interfered with his contractual relationship with Rhino.  Second, he contends that AutoX engaged in unfair competition in attempts to confuse consumers in Harriman's exclusive territory into believing that AutoX stores in that territory also offered Rhino products.  AutoX seeks summary judgment in its favor on both theories, and both parties cite decisions under Indiana common law to support their positions.

In *Felsher v. University of Evansville,* 755 N.E.2d 589 (Ind. 2001), the Indiana Supreme Court describes a cause of action for unfair competition as "historically considered a subspecies of the class of torts known as tortious interference." *Id.* at 598.  The claim is available when a party engages in conduct, the natural and probable effect of which is to deceive the public into believing that its goods or practices are those of another, the most common example of which involves trademark use.  *Id.*; see also *Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968).  The court finds that AutoX is entitled to summary judgment on the unfair competition claim.

First, the evidence that Harriman offers to show specific instances where AutoX allegedly infringed on his exclusive right to sell Rhino products in his territory is nearly universally inadmissible as hearsay.  For example, he claims to

have viewed a television commercial in which Ziebart (who is not a party) advertised that its franchises offered Rhino products. The commercial concluded with a listing of authorized Ziebart franchises in the area which included AutoX stores within Harriman's territory. His recitation of the Ziebart website's representation regarding AutoX being an authorized dealer of Rhino products similarly amounts to hearsay. Harriman's reliance on hearsay continues with his claim that he was told by employees at car dealerships, which constitute a large source of the spray on bed-lining business, that they were sending business to AutoX because it offered Rhino products at a cheaper price and that he was told the same by individual customers. Harriman further relies on hearsay responses given during anonymous telephone calls he placed when asking AutoX stores in his territory about their bed-lining products. Evidence to support or oppose summary judgment cannot be hearsay, but must meet the same admissibility standards applicable at trial. *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

There is another reason why Harriman cannot pursue a separate unfair competition claim, one that was essentially summarized by Harriman himself in his deposition. Harriman was asked if he ever complained directly to AutoX regarding any of the representations he claims AutoX was making about offering Rhino products. In response, he said that it was not his trademark at issue:

Q    Did you ever make any complaints directly to AutoX-10'd?

A      No.

Q      You always complained to Rhino Linings USA and let them handle it?

A      That is correct.

Q      Why didn't you ever make any complaints to AutoX-10'd?

A      Because it was Rhino USA's logo, it was Rhino USA's trademark that they were violating.  It wasn't my position to protect that trademark; it was Rhino USA's.

The unfair competition claim is not sufficiently supported by the evidence to stand as an independent claim.

The essential elements of a claim of tortious interference with a contractual relationship are:

1.      The existence of a valid and enforceable contract;

2.      The defendant's knowledge of the existence of the contract;

3.      The defendant's intentional inducement of a breach of the contract;

4.      The absence of justification; and

5.      Damages resulting from the defendant's interference.

*Stoffel v. Daniels*, 908 N.E.2d 1260, 1270 (Ind. App. 2009).  AutoX argues that it is entitled to summary judgment because Harriman has failed to support the first four elements.  The court disagrees.

AutoX first argues that there was no contract between Rhino and Harriman at the time it took over his territory.  This argument is a complete non-starter. Viewing the evidence in the light reasonably most favorable to Harriman, the interference he complaints about occurred while his dealer contract with Rhino was in place, even if it did not reach its culmination until his contract expired and Rhino replaced him with AutoX.

Next, AutoX contends that Harriman has no evidence that it knew of any contractual agreement between Rhino and Harriman.  While there may be no direct evidence that AutoX knew the specific details of the contractual relationship, there is powerful circumstantial evidence showing that AutoX was well aware of the existence of Harriman's dealer contract, including its geographical exclusivity provisions.  In addition to the evidence discussed earlier in this entry with regard to the claim against Rhino, the following additional facts point to AutoX's knowledge of the existence of the contract and likely understanding of its exclusivity provisions before it took over Harriman's territory:

1. AutoX purchased a similar Rhino dealership in Ft. Wayne, Indiana in 2004.

2. AutoX became a seller of Rhino products and services as a Ziebart Franchisee in areas surrounding Harriman's territory years before Harriman's dealer contract expired.

3. Denny Fryman, the owner of AutoX, admits to knowing his competitors and, specifically, that Harriman owned the rights to sell Rhino products in the Indianapolis area.

4.    There is a letter written, but not sent, by Rhino's former CEO that discusses a compromise between Harriman, Fryman, and another of Harriman's competitors regarding the use of certain Rhino products and Harriman's pursuit of a Ziebart franchise.

5.    Harriman and Jim Harris, who managed the AutoX business on a day-to day basis, had discussions regarding the sale of some or all of Harriman's stores to AutoX as far back as 2005 and again in 2007.

6.    Harris sat on the Rhino Dealer Advisory Board, beginning in 2006.

The third element of Harriman's tortious interference claim is evidence to support the inducement of a breach by AutoX. This is where Harriman's evidence thins, but not so much as to require summary judgment against him. There is circumstantial evidence indicating that the principals of AutoX had long had an interest in becoming a Rhino dealer in at least a portion of Harriman's exclusive territory. First, there is Harriman's testimony that he obtained the Rhino dealership rights only after Jim Harris's attempt to obtain the rights fell through.[4] Next, there was an inquiry made by Harris to Harriman some time in 2004 or 2005 as to Harriman's willingness to sell his Greenwood, Indiana store, a store within Harriman's exclusive territory. Finally there is the testimony of Pierre Gagnon, who became Rhino's CEO in 2006, that some time during that year Harris expressed to him an interest in acquiring Harriman's Rhino dealerships on behalf of AutoX.

---

[4]AutoX questions Harriman's ability to testify with personal knowledge of any attempt by Harris to obtain such rights; but, notably, it never offers any contrary sworn testimony.

An interest in acquiring the Rhino dealerships is not sufficient by itself of course to support a claim that AutoX induced a breach of the dealer contract. However, when combined with the evidence that Harriman describes as the "smoking gun," it is enough to take Harriman past the summary judgment motion.  That evidence is the February 2007 email sent by one of Rhino's regional account managers to, among others, Pierre Gagnon.  The email discussed the pursuit of another dealer, which happened to be within 38 miles of the Ft. Wayne Ziebart franchise held by AutoX, to sell Rhino products.  The email reminded those who received it that the Ft. Wayne store was the top selling Rhino store for Ziebart and then went on to state in pertinent part:  "we are working on having Jim [Harris] and Denny [Fryman] buy out Marty Harriman.  Based on that overall scenario, I would recommend putting this dealer on hold for now to see how the rest of the business comes together for Jim and Denny."  The relevant portion of the email concluded with the regional manager stating that he would like to see Jim and Denny's deal, presumably for Harriman's territory, closed before aggressively pursuing the new dealer.

The email is susceptible to several interpretations, but at this stage it must be viewed in a light most favorable to Harriman as the non-moving party.  From that email and other circumstantial evidence, a jury could infer that AutoX wielded significant influence with Rhino due to its being Rhino's top selling dealer. Certainly, from the email one can easily conclude that Rhino was reluctant to pursue another dealer in an area too near an AutoX store until it had helped

AutoX with its objective of obtaining the Rhino sales rights in the Indianapolis area then held by Harriman. With that in mind, it would not be too big a logical leap to infer that Rhino was helping AutoX by pressuring Harriman out of his contract by demanding an unreasonable increase in his quota. Accordingly, AutoX is not entitled to summary judgment on the third-party claim against it for tortious interference with a contractual relationship.

### Conclusion

The major issues in this case pivot on conflicting testimony and competing inferences to be drawn from the facts. There is too much competing evidence regarding material questions of fact for any of the parties to avoid a trial. All three parties' motions are granted in part and denied in part. Rhino's motion for summary judgment is granted with respect to Harriman's counterclaim that Rhino breached the exclusivity provisions of the dealer contract in its dealings with Ziebart and AutoX while Harriman was still a dealer. Rhino's motion is denied in all other respects. Harriman's motion is granted as to liability on his counterclaim that Rhino breached the exclusivity provisions by supplying Dallman Industrial Corporation, but is denied in all other respects. AutoX's motion is granted in part with respect to Harriman's distinct claim of unfair competition. AutoX's motion is denied in all other respects.

So ordered.

Date:  September  29, 2009

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Sara R. Bradbury
LEWIS & KAPPES
sbradbury@lewis-kappes.com

James  Dimos
FROST BROWN TODD LLC
jdimos@fbtlaw.com

Peter S. French
LEWIS & KAPPES
pfrench@lewis-kappes.com

Richelle Marie Harris
FROST BROWN TODD LLC
rharris@fbtlaw.com

David Scott Klinestiver
LEWIS & KAPPES
dklinestiver@lewis-kappes.com

Patrick F. Mastrian III
pmastrian@brown-tompkins-lory.com

Brett J. Miller
BINGHAM MCHALE LLP
bmiller@binghammchale.com

Gary P. Price
LEWIS & KAPPES
gprice@lewis-kappes.com

Randall D. Rogers Jr.
LEWIS & KAPPES
rrogers@lewis-kappes.com

Joel E. Tragesser
FROST BROWN TODD LLC
jtragesser@fbtlaw.com